**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

**MICHAEL SANTANA,**

**Plaintiff,**

**v.** **CASE NO. 3:25-cv-598-MCR-HTC**

**FELIPE PINTO,**

**Defendant.**
__________________________________/

# ORDER

Plaintiff Michael Santana has sued Defendant Deputy Felipe Pinto of the Santa Rosa County Sheriff's Office for malicious prosecution in violation of the Fourth Amendment, under 42 U.S.C. § 1983, after Santana was charged, tried, and acquitted of the crime of stalking under Florida law for sending harassing text messages to his ex-girlfriend. *See* Fla. Stat. § 784.048(2). After careful consideration of the Parties' cross-motions for summary judgment, ECF Nos. 22 & 25, both motions will be denied.

## I. Facts

Santana's ex-girlfriend, Bianca Wyler, gave birth in August 2022 to their now four-year-old daughter, but the couple broke up months later.[1] Santana stayed in

[1] The Court views "the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmovant." *Martin v. Brevard Cnty. Pub. Sch.*, 543 F.3d 1261, 1265 (11th Cir. 2008) (internal marks omitted); *see also FCOA LLC v. Foremost Title & Escrow Servs. LLC*, 57

California where they had lived, while Wyler subsequently married and moved to Santa Rosa County, Florida, with the child. Under a custody order, Wyler has physical custody of the child, but they share legal custody, and Santana is entitled to a certain number of visitation days each year and reasonable phone communication with the child. Despite sharing a child, the relationship between Santana and Wyler was contentious, to put it mildly, as evidenced by multiple electronic messages in this record. Those messages led to Wyler contacting the Santa Rosa County Sheriff's Office on three occasions over the course of a five-month period from April through September 2024.

On the first occasion, April 21, 2024, Deputy Pinto and his trainee, Deputy Michael Nay, were dispatched to Wyler's home after she reported receiving "death threats" from Santana. Wyler told the deputies Santana had been sending her death threats for "months," though she also said it had been happening for the "past couple of weeks," and it had gotten to the point that she was in fear. Wyler's current husband, Patrick, who lives with her and the minor child, was present on April 21, 2024, and told the deputies that Santana had threatened to call the police and report

F.4th 939, 959 (11th Cir. 2023) (cross motion standard). On the issue of qualified immunity, the Court considers the facts in Santana's best case. Unless otherwise noted, the Parties have not disputed the facts but dispute the inferences to be drawn from them. The facts are taken from the record evidence: (1) Deputy Pinto's body camera footage from April 21, May 13, and September 6, 2024; (2) police reports; (3) the probable cause affidavit; (4) the arrest warrant; (5) Deputy Pinto's deposition; (6) Deputy Pinto's testimony at Santana's criminal trial; (7) Deputy Pinto's testimony at a civil injunction hearing; (8) Santana's deposition; and (9) Santana's messages on TalkingParents.

Wyler, stating he was concerned for the child's safety and that Sanatana was "just freaking out" because "he doesn't get his way" regarding phone communications with the child.

Wyler explained that the messages were all sent through TalkingParents,[2] and she had saved screenshots of everything significant. Deputy Pinto looked through the TalkingParents application and saw the following messages from Santana that morning:

> 7:22 AM: No false accusations. Wellness checks are absolutely something the state of Florida allows once a parent hasn't seen their child and suspects something could be wrong. I have photos of marks on [redacted name of minor child]. You're also being uncooperative which is also a concern.
>
> 7:25 AM: Wellness checks and CPS are services that are in place for safety of children in Florida. One day whether it's in your hospital bed soon when you give birth [she was pregnant with her second child, this one with Patrick] but at some point karma will get you. I won't be apart of it bc I'll be a spectator to it but I'll enjoy seeing that karma take place.
>
> 7:27 AM: Enjoy your day and I'm waiting for one day to get a call saying I have full custody. Praying that day comes soon hopefully within weeks.

ECF No. 21-4 at 2. After reading the messages, Deputy Pinto asked Wyler—"Is this it?" Deputy Pinto said, "there isn't a threat" on these messages, Santana is "just saying karma's gonna come get you." Wyler then opened up a screenshot of other messages Santana sent on TalkingParents, on April 10, 2023, one year earlier, in

[2] TalkingParents is a messaging platform for separated parents to communicate with each other on familial issues.

which Santana stated that he did not want Wyler in his life and that the "only way that would happen is your death. . . we all gotta go sometime, why not now. I know you want the same." Again, Deputy Pinto said this was not enough and that none of the messages constitute death threats under Florida law.[3] Deputy Pinto advised Wyler that he would make a report and told her that if Sanatana sends a message that says, "I'm going to kill you, I'm going to have someone kill you, I'm going to have someone hurt you," then "we can write a report, write a warrant, we'll send it off to California . . . and they'll put him in jail."

During this visit, Deputy Pinto also reviewed the child custody order between Wyler and Santana because Wyler and Patrick complained that Santana had been unreasonably telephoning every day without scheduling calls. Deputy Pinto offered his opinion that "reasonable phone communication" in the order meant one call per day at a scheduled time—and if Santana misses it, he is out of luck. When Wyler asked whether Santana's calls constituted "harassment," Deputy Pinto explained that they were not considered harassment because he is trying to talk with his child, which the custody order allows. However, he agreed with Wyler that the overall tenor of Santana's communications (including the messages) was beginning to approach harassment, and he advised her not to respond to any message from

[3] A specific Florida statute governs death threats. *See* Fla. Stat. § 836.10(2)(a) ("It is unlawful for any person to send, post, or transmit . . . a writing or other records . . . when . . . the person makes a threat to: [] kill or to do bodily harm.").

Santana unless it directly implicated their child.[4] Deputy Pinto then called Santana about Wyler's complaints and told him he was on a "very thin line as far as stalking or harassment or making threats."[5] ECF No. 21-3 at 3-4 (he also characterized the messages as "vague threats"). Santana apologized for the messages and said they were sent out of frustration.

On a second occasion, May 13, 2024, Deputy Pinto and Deputy Nay responded again to Wyler's home to review continuing messages from Santana. Wyler showed the deputies some recent messages from Santana and said he was doing the "same thing" and "wishing me death" and she was worried he might abduct their child. Deputy Pinto viewed messages in which Santana called her an obscene name while asking for contact with his child:

> [May 10] 9:48 AM: You fucken cunt.
>
> [May 10] 9:49 AM: You don't make the rules ok so don't give me your bullshit schedule. . . .
>
> [May 11] 9:49 AM: Listen you cunt I'll just go to my attorney now. I wish nothing but the worst for you and I hope I get a call one day soon that you're no longer capable of taking care of my daughter or that you no longer exist.

---

[4] *See* ECF No. 18-1 at 26:26-26:47 ("And don't reply to him, just let him talk all he wants. And then when he brings her up, then you can say something in reference to your daughter. That way it shows that the only . . . communication you have is [in reference to] her.").

[5] Inconsistently, in Deputy Pinto's deposition testimony he indicated that if he had been called to Wyler's home about harassment, he would have written an arrest warrant that day, but instead, he attempted to deescalate the situation because the complaint was only about death threats and he said Wyler just needed to know the difference. *See* ECF No. 21-1 at 77–79.

> [May 11] 9:50 AM: I've never thought I wish that upon anyone but I truly mean it.
>
> [May 11] 9:51 AM: I choose the attorney route. Have a painful day bitch.
>
> [May 11] 9:51 AM: I hope you vanish one day. It will make my life that easier.
>
> [May 11] 11:11AM: I just thought of something I'll keep [her] extra in June [when I pick her up for visitation] lol nothing you can do if I decide to keep her extra 😆 [laughing emoji]. I'm gonna fuck with you in my way my terms. Just like you wanna do what you want [when you are with her] once I have my possession [my daughter] if I wanna change [her] flight and keep her longer I will lol.
>
> [May 11] 11:13 AM: Keep me from talking to my daughter come June **I'll get even with you** ✌️ [peace sign emoji] it will happen too. I'll see you in June.
>
> \- - - - - - - - - - -
>
> [May 12] 11:24 AM: The fact that my mom can't FaceTime her grand daughter on Mother's Day. I just want to let you know you are a piece of worthless shit.
>
> [May 12] 11:25 AM: I hope one day you meet your fate that's my wish to you.
>
> \- - - - - - - - - - -
>
> [May 13] 10:10 AM: Ok your no longer cooperating.
>
> [May 13] 10:11 AM: It's fine keep that same [uncooperative] energy when I have her in June and I decide to keep her [for] longer time if I want too.
>
> [May 13] 10:13 AM: If you're dead or a vegetable and no longer able to care for our daughter let me know so I can go pick up my daughter.
>
> [May 13] 10:13 AM: I'm hoping to get that type of news one day.

ECF No. 21-4 at 3-6, 11 (text message exhibits); ECF No. 18-2 at 6:21 (body camera video) (emphasis added). Again, Deputy Pinto found no grounds for arrest.

However, after reading the messages, he explained to Wyler and Patrick the proper procedures for acquiring a temporary restraining order against Santana (*e.g.*, the paperwork for submission, where to submit the paperwork). Wyler asked Deputy Pinto whether she should respond to Santana, and he said, "Nah nah nah. You don't -- you leave him the way he is . . . just let him keep going." Patrick told the deputies that Wyler had originally permitted Santana to call Monday through Wednesday between a certain time but, because of the situation, she had not been responding, and he asked whether they could ignore Santana's repeated requests for calls. Deputy Pinto replied, "100% Just ignore it" and put him on silence. Deputy Pinto also advised them of the possibility of requesting that a deputy be stationed outside the home for a short period of time if she felt unsafe.

There is no evidence that Wyler ever made such a request, and apparently June, July, and August went by without incident. At his deposition in this case, Deputy Pinto acknowledged that he did not believe these messages posed a threat to anyone's safety. He believed that Santana was frustrated since Wyler was not facilitating phone calls between him and the child, and this was similar to a "tit-for-tat" visitation situation. *See* ECF No. 21-1 at 91:18-25, 91:1-3 (Question: "So he's calling her names, he's threatening to get even with her by keeping the daughter longer or not letting Wyler talk to the daughter when the daughter is in California with him, right?" Answer: "Yes, sir." Question: "There's no threats of bodily harm

here, right." Answer: "No sir. Or yes, you're right."); *id*. at 89:18-20 (Question: "Kind of like a tit for tat situation that he's proposing. Do you see that?" Answer: "Yes, sir.").

On September 6, 2024, Deputy Pinto was dispatched to Wyler's home for the third time, after she had contacted the Sheriff's Office and spoke with another officer. She reported that nothing had changed and Santana was continuously harassing her, so Deputy Pinto followed up. Wyler told him Santana was coming for a scheduled visit the next weekend and had messaged her that "I'm going to get even with you and watch karma is going to get you."[6] Deputy Pinto did not review the messages while he was at the home, but from the conversation, Wyler indicated she had sent them to him, and Deputy Pinto indicated he had read them. Wyler also informed Deputy Pinto that she had applied for a temporary restraining order. She indicated to him that she preferred Santana be arrested, which would save her the cost of serving the injunction.[7] She also was concerned that Deputy Pinto should include everything in his report so she could use it in a custody proceeding and

---

[6] This was in a text message dated August 31, 2024. This was the same type of statement he had made in a message on May 11, 2024—that he had an upcoming visitation in June, that he would keep the daughter longer than allowed, that "I'll get even with you," and that he hoped she would vanish one day so he could have the daughter. In both instances, the context plainly indicates that he was referring to keeping the daughter longer but did not threaten to harm anyone.

[7] The temporary injunction was served on Santana in jail after his arrest, but he stated in his deposition that a hearing was held in October 2024 and that no permanent injunction was entered. ECF No. 24–10 at 67–68.

indicated her lawyer had wanted her to file for a restraining order in California when she went to pick up the child, but Wyler thought it would be easier here. The body camera video shows the following exchange:

- **Wyler**: . . . . I want to be able to show the judge the history of this and also the history of him basically trying to weaponize our daughter so that I can hopefully get full custody or at least . . . for him to have monitored visitation because I am very worried he's gonna take her and not return her or do something because he's already threatened that.
- **Deputy Pinto**: So what's he doing here -- ? Or you said he was coming into town today[, September 6]?
- **Wyler**: So he's coming into town because we had agreed that he was going to pick her up. And so the conversation started with him being, like, . . . I'm only allowing [] facetime calls with her Monday through Wednesday, [and] he's pissed about that like he's always been, and he said, "well don't worry, I'm going to get even with you when I come into town." And then he had just continued to send death threats, and death threats, and it's like, "I'm going to get even with you and watch karma is going to get you." I called my lawyer, [who] said: "Well when you [fly] into California to come [pick up your child after Santana's comes to Florida and takes her to California for his visitation] we'll file a restraining order [in California]." I'm like: "You know what. Let me call the Sheriff here because I feel like I shouldn't have to go through all of that." . . .
- **Deputy Pinto**: . . . I'll write this up now. I'll go back out to my car and get it all written up. It's gonna be the same case number I gave you last time. . . . I'll submit everything and then I'll submit a warrant. If he's here and it gets approved before the end of the day -- I'll pick him up wherever here is, as long as he's in this county. I can't go over to Escambia [County], but I can send Escambia [Police] to get him if he's staying over at like the airport hotel or something like that.
- **Wyler**: I'm not sure where he's staying, but I sent you the flight itinerary –
- . . .
- **Deputy Pinto**: . . . Anything else I can answer for you before I leave?
- **Wyler**: That's it. I was able to speak to a family law lawyer and she agreed with what you said, with what they said, and she said this is enough for: [*Wyler sighs, unintelligible language*]. But she said to "make sure that in the report it says all the dates, all the incidents, because [this] will be easier . . . to get [either] some

> sort of temporary custody arrangement so that he doesn't take her and or that there's no threat of that -- and also if the judge deems: "Moving forward you need to have monitored visits because of how everything's been progressing," that you just have that [entire] record [in your report].

ECF No. 18-3 at 3:02-6:01 (body camera video).

After Deputy Pinto left Wyler's home on September 6, he drafted a probable cause affidavit for Santana's arrest, attesting to the following:[8]

> On 4/21/2024, the suspect, Michael Santana (DOB [redacted]) did knowingly violate F.S.S. 784.048.2 Stalking (DOMESTIC VIOLENCE), when sending multiple harassing text messages to the victim, Bianca Wyler. The facts are as follows:
>
> On 9/6/2024, I responded to [redacted address], Pace, Florida in reference to the victim, Bianca, being harassed over text messages by her ex-husband Michael Santana. While speaking with Bianca, she provided me with the following information: On 4/21/2024 Bianca stated her ex-husband Michael Santana was sending her obscure messages wishing her death. She stated Michael was upset due to the nature of the custody agreement for their daughter. Bianca has asked Michael to use the Parenting App to solely speak about their child, to which Michael has ignored.
>
> Bianca has provided me with multiple photos of the text chain. In the text chain Santana calls Bianca, a "Cunt." Michael also states in a text message on 8/31/2024 "I'll get even with you next weekend. Trust me it's coming." Throughout the text chains Michael makes various statements and threats to Bianca.
>
> I spoke with Michael Santana via phone call and explained that his messages were concerning. Michael expressed that he was upset about the custody situation and did make the statements.
>
> As of 9/6/2024, Michael has continued to make harassing statements towards Bianca through a Family App and placing her in a well-founded fear for her life and her children, due to the nature of his statements.

---

[8] The heading of the affidavit states that the "date" range is: April 21, 2024 - September 6, 2024.

> Based on the above facts, I respectfully request a capias be issued for Michael Santana in violation of F.S.S. 784.048.2 – stalking (DOMESTIC VIOLENCE).
>
> This offense occurred in Santa Rosa County, Florida.

ECF No. 1-1 at 2.

After drafting the affidavit, Deputy Pinto returned to Wyler's home and gave her a "Santa Rosa County Sheriff's Office Victim Notification of Offense Release" form, which he helped her fill out. He left, saying, if Santana comes here, she should call—"just call us and he goes straight to jail." ECF No. 18-4 at 1:19-29. Deputy Pinto's affidavit was reviewed and approved by his immediate supervisor, Sergeant Nix, and a higher up, Lieutenant Miller, before it was submitted to the magistrate judge who issued the warrant.

Santana was arrested when he landed at the Pensacola airport on September 6 and spent four days in county jail. Deputy Pinto testified at Santana's criminal trial that Wyler was afraid for her family. On cross examination, he acknowledged that at one point, Wyler had told him she was afraid that Santana was not going to return their daughter or might make some false report that would jeopardize her husband's military career. Deputy Pinto also testified at the criminal trial and in his deposition that he had told Wyler at some point during their first meeting on April 21 and again on May 13 that Santana's messages (or, at least, certain messages) were insufficient for "stalking" and did not constitute death threats, and he saw nothing new on

September 6.[9] He further testified that he did not know whether Wyler faced any harm but indicated it is always a possibility—he did not want to take any chance that Wyler could be harmed.[10]

Santana was found not guilty of stalking at a bench trial, and this civil rights lawsuit against Deputy Pinto followed.

---

[9] Deputy Pinto's testimony shows he inconsistently did not consider the messages to contain death threats yet took Wyler at her word on September 6 when she said she was receiving death threats. *See* ECF No. 21-2 at 22:8-12 ("Question: "You pointed out where she says he continued to send death threats and death threats. But twice already, you had told her that his statements, such as karma is going to get you, was insufficient, correct, for stalking." Answer: "Yes, ma'am."); ECF No. 21-1 at 46:5-7 ("The first time I went out and she said that these were threats and we read them and I was like these aren't threats."); *e.g., id.* at 58:8-13 (Question: "And after looking at these text messages you determined that Santana had not sent her death threats?" Answer: "Right. Yes, sir." Question: "And so her statement was inaccurate?" Answer: "For death threats, yes sir."). ECF No. 21-2 at 34:11-13 ("Question: But you didn't see anything new. You didn't see anything new on September 6, did you?" Answer: "No, ma'am." *But see id.* at 34:11-14 (Question: **"So on September 6, you went by [Wyler's] *statements* to submit a warrant, *saying* that he was sending death threats since April 21, right? Right?" Answer: "Yes."**) (emphasis added).

[10] ECF No. 21-2 at 10:7-10 (Question: "And you knew then, on about September 6th, you knew that he was coming in town to exercise his timesharing under the California [custody] order, didn't you?" Answer: "Yes."); ECF No. 21-1 at 144:6-10 ("This last section 'I will get even next week with you, trust me, it's coming' he could have very well showed up to her doorstep, shot her in the face and took her daughter. But I would not let it get that far, so I wrote a warrant for his arrest."); *id.* at 137:10-15 ("There have been multiple calls where we go to a house and we take what they say and we're like nothing is going to happen, and then we come back out and somebody got their eye socket knocked in. I mean, I have to take every chance I have to prevent something more from happening."); *id.* at 140:12-25, 141:1 (Question: "Do you think it was significant in your Probable Cause determination that [Santana] had used that phrase ["I'm going to get even"] in the past to mean something different [namely, limit communication with the child]?" . . . Answer: "No. My probable cause statement . . . is only giving the information critical to a judge to make a decision on whether or not its enough. I am not there to go [write], well, he said he will get even with her over her daughter [before], but the conversation has escalated and now he's coming into town and saying he's going to get even with her. **I don't know if he's going to come here and get even with her physically or he's going to harm her in any way, shape or form.**") (emphasis added); *id.* at 143:8-12 ("The only portion that I consider when I'm writing a warrant affidavit for a statute, for any statute, is what substantiates that statute so that a judge can look at it and go, you know what, this is enough.").

Page 13 of 30

## II. Legal Standard

Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A fact is "material" if under the applicable substantive law, it might affect the outcome of the case. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986). A factual dispute is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The movant bears the burden of demonstrating the absence of a genuine dispute of material fact, which then shifts to the nonmovant to demonstrate that a material question of fact exists. *See Celotex*, 477 U.S. at 323-24. "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (internal quotations omitted).

When, as here, qualified immunity is raised by the defendant at summary judgment, "the analysis does not halt simply because genuine issues of material fact remain." *Lopez v. City of Opa-Locka*, 788 F. Supp. 3d 1223, 1238 (S.D. Fla. 2025) (citing *Robinson v. Arrugueta*, 415 F.3d 1252, 1257 (11th Cir. 2005)). Instead, the court must view the evidence in the light most favorable to the plaintiff and consider

whether, on those facts—that is, the plaintiff's "best case"—a constitutional right was violated, and if so, "whether on that version of the facts, the right was clearly established at the time of the violation." *Id.* (citing *Robinson*, 415 F.3d at 1257).

**III. Discussion**

The Supreme Court has recognized a Fourth Amendment malicious prosecution claim.[11] *Butler v. Smith*, 85 F.4th 1102, 1111 (11th Cir. 2023) (citing *Thompson v. Clark*, 596 U.S. 36, 42 (2022)). The claim permits recovery against an individual who "initiated or caused the initiation of criminal proceedings despite having 'no good reason to believe' that criminal charges were 'justified by the facts and the law.'" *Thompson*, 596 U.S. at 43 (quoting T. Cooley, Law of Torts 180 (1880)). The Fourth Amendment malicious prosecution claim focuses on the "legal process" at issue and whether something with that process went wrong. *Aguirre v. Seminole Cnty.*, 158 F.4th 1276, 1301 (11th Cir. 2025) ("The gravamen of a malicious-prosecution claim is that a Fourth Amendment violation occurs when legal process itself goes wrong—when, for example, a judge's probable-cause determination is predicated solely on a police officer's false statements.") (internal quotations omitted). The plaintiff must prove "(1) the elements of the common-law

[11] Santana's original complaint also included a state common-law malicious prosecution claim, which was settled by the Parties. The First Amended Complaint was then filed, which includes only a § 1983 constitutional claim.

tort of malicious prosecution and (2) a violation of his Fourth Amendment right to be free from unreasonable seizures." *Butler*, 85 F.4th at 1111.

Thus, the constitutional tort of malicious prosecution has six elements: (1) a "criminal prosecution instituted or continued by the present defendant;" (2) "with malice and without probable cause;" (3) the prosecution terminated in the plaintiff's favor; (4) the plaintiff suffered damage; (5) the legal process—which encompasses a probable cause affidavit—was "constitutionally infirm;" and (6) absent legal process the seizure would not have been justified. *See Prospero*, 153 F.4th 1171, 1183 (11th Cir. 2025). The Eleventh Circuit has clarified that the second element (malice and lack of probable cause) merges with the fifth element (whether the legal process was constitutionally infirm), and both are analyzed together. *Butler*, 85 F.4th 1112; *see also Luke v. Gulley*, 975 F.3d 1140, 1144 (11th Cir. 2020).[12] Here, there is no genuine dispute of material fact on elements (1), (3), (4), and (6).[13] This leaves only the merged elements (2) and (5) in dispute, raising the single issue of

[12] *See also Luke v. Gulley*, 50 F.4th 90, 95 (11th Cir. 2022) (observing that in the 2020 *Luke v Gulley* appeal, "we simplified our standard for malicious prosecution into two elements: the plaintiff must prove (1) that the defendant violated his Fourth Amendment right to be free from seizures pursuant to legal process and (2) that the criminal proceedings against him terminated in his favor.").

[13] Indeed, it is undisputed that (1) Deputy Pinto's affidavit led to Santana's criminal prosecution, (3) the prosecution terminated in Santana's favor, (4) Santana suffered damage as he spent four days in jail, and (6) Santana's seizure would not have been justified absent legal process since he was held in jail for longer than 48 hours based on the warrant. *See Butler*, 85 F.4th at 1112 (noting detention for longer than 48 hours is "presumptively unconstitutional—and thus not otherwise justified—if effectuated without legal process.") (internal citations and quotations omitted).

whether Deputy Pinto's probable cause affidavit was "constitutionally infirm." *See Butler*, 85 F.4th at 1111.

An affidavit can be constitutionally infirm for one of two reasons. First, an affidavit is constitutionally infirm if "the officer who applied for the warrant should have known that [the] application failed to establish probable cause [on its face]." *Id.* at 1112 (internal quotations omitted). Second, and independently, an affidavit is constitutionally infirm if the affiant "intentionally or recklessly made misstatements necessary to support the warrant." *Id.*; *Land v. Sheriff of Jackson Cnty., Fla.,* 85 F.4th 1121, 1126 (11th Cir. 2023)1126 ("The warrant does nothing to satisfy the Fourth Amendment's probable-cause requirement when the judge was presented with materially incorrect information.") (internal quotations omitted, alterations accepted). An affidavit supports probable cause when the totality of the circumstances allows a reasonable officer to conclude that there was a substantial chance of criminal activity. *Land,* 85 F.4th at 1126-27. Probable cause is not "a high bar" and is lower than even a "preponderance of the evidence." *Paez v. Mulvey*, 915 F.3d 1276, 1286 (11th Cir. 2019). To assess probable cause, the Court considers the facts in light of the elements of the charged crime. *Butler*, 85 F.4th at 1116.

A.

Santana first argues that the affidavit is facially infirm for the failure to establish probable cause because it did not support an essential element of the crime.

*See id.* The warrant affidavit in this case charged Santana with stalking by sending multiple harassing text messages to Wyler, in violation of Florida law, *see* Fla. Stat. § 784.048(2). The stalking statute criminalizes conduct that "willfully, repeatedly, and maliciously follows, harasses or cyberstalks another person" and defines "harass" as engaging in a course of conduct that causes the person "substantial emotional distress" and "serves no legitimate purpose."[14] Fla. Stat. § 784.048(2), (1)(a). Substantial emotional distress is "conduct so extreme" that it "overwhelm[s] an ordinary person," and Florida courts have consistently held that conduct has a "legitimate purpose" if there is "some reason other than pure harassment," that is, the "communications serve a lawful function." *Carvajal v. Feretti*, 434 So. 3d 72, 82–83 (Fla. 4th DCA 2026) ("recognizing that human interactions, particularly those arising out of domestic disputes, often carry mixed motives without becoming unlawful").

Santana argues that the failure to state there was "no legitimate purpose" for the messages is fatal and that in fact, the affidavit indicated a legitimate purpose because it stated he was upset regarding the child custody arrangement for their daughter. Deputy Pinto responds that the affidavit should not be assessed in a

---

[14] The statute similarly defines "cyberstalk" as engaging "in a course of conduct to communicate . . . words, images, or language" electronically to a specific person and similarly requires that it cause "substantial emotional distress to that person" and serves "no legitimate purpose." Fla. Stat. § 784.048(1)(d).

hypertechnical manner requiring "magic words" and notes that a neutral magistrate judge assessed the averments in their totality and found them sufficient. The Court agrees with Deputy Pinto that an affidavit need not contain particular words or phrases; courts look to the substance of the facts stated. See *Land*, 85 F.4th at 1128 (demonstrating that courts look to the substance of the facts in an affidavit rather than particular words or phrases to determine probable cause and arguable probable cause). And although probable cause is assessed in relation to the elements of the crime, an officer is not required to prove every element of the charged offense before making an arrest. *See Butler*, 85 F.4th at 1116 ("an officer needn't prove every element of the charged crime"). Moreover, the issuing magistrate is charged with making a practical, commonsense decision and is given a "high level of deference" in making that determination. *United States v. Miller*, 24 F.3d 1357, 1361 (11th Cir. 1994) (cautioning reviewing courts to "not interpret supporting affidavits in a hypertechnical manner").

The Court concludes that the totality of the circumstances as presented on the face of the affidavit allowed the reasonable conclusion that the conduct had gone beyond any legitimate purpose regarding a child custody arrangement. The affidavit states that in Deputy Pinto's assessment, on September 6, 2024, Wyler had "a well-founded fear for her life and her children, due to the nature of [Santana's] statements." Considering that assessment in combination with the factual assertions

on the face of the affidavit reciting that Santana "was sending [Wyler] obscure messages wishing her death," that he continued making threats after being confronted by Deputy Pinto, and that Santana was coming to town this weekend to "get even" with Wyler, the affidavit was sufficient to show that Santana had gone beyond any legitimate child custody purpose by causing Wyler to fear for her life. *See generally Floyd v. Stoumbos*, No. 22-11679, 2023 WL 2592297, at *4 (11th Cir. Mar. 22, 2023) (evaluating whether there was no legitimate purpose by considering the collective manner in which actions were performed and concluding that the manner by which the defendant performed actions in that case cast doubt on the legitimacy of their purpose). Santana's motion will be denied on this ground.[15]

B.

Santana also moves for summary judgment on grounds that the affidavit is constitutionally infirm because of material misstatements and omissions. Deputy Pinto disagrees and also moves for summary judgment, arguing that even if a constitutional violation occurred, he is entitled to qualified immunity because there was at least arguable probable cause.

In the § 1983 context, an officer is entitled to qualified immunity from suit and from liability for acts taken while performing a discretionary function of his job,

---

[15] And no one has questioned whether Wyler's well-founded fear for her life and her children would be sufficient to show substantial emotional distress within the meaning of the statute.

unless the officer violated an individual's clearly established federal statutory or constitutional rights.[16] *See District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). When examining probable cause with regard to a warrant application in the qualified immunity context, immunity is lost "[o]nly where the warrant application is so lacking in indicia of probable cause as to render [an] official belief in its existence unreasonable . . . provided that the officer believes that the facts alleged in his affidavit are true." *Malley v. Briggs*, 475 U.S. 335, 344-45 (1986). This is described as "arguable probable cause." *See Grider v. City of Auburn*, 618 F.3d 1240, 1257 (11th Cir. 2010). Arguable probable cause similarly depends on the elements of the crime charged and the operative facts and entitles an officer to qualified immunity if that officer reasonably but mistakenly concludes that probable cause is present. *Id.*; *see also Aguirre*, 158 F.4th at 1301 ("This arguable-probable-cause standard asks whether a reasonable officer in the same circumstances and possessing the same knowledge as the Defendant could have believed that probable cause existed.") (quotations omitted, alterations accepted). The Eleventh Circuit has held that it "is

[16] The Parties do not dispute that Deputy Pinto was engaged in a discretionary function, so the only remaining issues for qualified immunity purposes are whether he violated Santana's constitutional rights viewing the facts in Santana's favor, and whether those rights were clearly established at the time. *See Stefani v. City of Grovetow*, 780 F. App'x 842, 847 (11th Cir. 2019). Santana bears the burden on these remaining issues, *id.,* but as noted above, on qualified immunity, the facts and all inferences are viewed in his favor at the summary judgment stage. *Robinson*, 415 F.3d at 1257.

clearly established that intentionally or recklessly omitting material information from a warrant affidavit violates the Fourth Amendment." *Butler*, 85 F.4th at 1112.

An intentional or reckless misstatement is a fact proffered by an affiant without a "reasonable belief in the veracity of the information" provided. *See Prospero*, 153 F.4th at 1183 n.9 (quoting *Butler*, 85 F.4th at 1114); *see also Paez*, 915 F.3d at 1287. Notably, a misstatement can include a fact that is "true in the technical sense" but is plainly misleading by the failure to include facts and circumstances that add context, or that add or detract from the reliability of a conclusion. *Aguirre*, 158 F.4th at 1305. So, if an affidavit contains an intentional or reckless misstatement or omission, the court considers whether probable cause, or at least arguable probable cause, would be negated if the misstatements were removed and/or the omissions included. *Id.* at 1301–02; *see also Sylvester v. Fulton Cnty., Jail,* 94 F.4th 1324, 1331 (11th Cir. 2024) ("We remove from the affidavit any false or misleading inculpatory statements, insert any omitted exculpatory information, and then assess whether the corrected affidavit is still able to establish at least arguable probable cause.").

The only facts before the magistrate judge were the statements in the affidavit, which included that: Wyler was "being harassed" by Santana; he was sending her "obscure messages wishing her death;" he was "upset due to the nature of the custody agreement;" he ignored her when she asked him to use the parenting app

(over which he sent messages) solely for communications about the child; he called her a foul name; and he told her "I'll get even with you next weekend. Trust me it's coming." The affidavit also stated that Deputy Pinto spoke with Santana and Santana admitted making the statements and then continued to make harassing statements, "placing [Wyler] in a well-founded fear for her life and her children, due to the nature of his statements."

The determinative issue in this case is whether the affidavit was materially misleading. Deputy Pinto's reasonable belief in the veracity of his statement that the nature of Santana's messages caused Wyler to have "a well-founded fear for her life and her children" is in question. This statement was material to probable cause because it provided the magistrate judge a basis for concluding that Santana's harassing conduct was severe enough to cause Wyler "substantial emotional distress," especially when viewed together with Santana's "I'll get even" threat, and, as already noted, that the conduct went beyond any legitimate purpose, for purposes of the stalking statute. *See* Fla. Stat. § 784.048(2), (1)(a) (stalking requires pattern of harassing conduct that causes "substantial emotional distress" and "serves no legitimate purpose"). But the record includes conflicting inferences as to whether Deputy Pinto reasonably believed in the veracity of the statement, given several omissions as outlined below.

Page 23 of 30

Viewing the record and all inferences in Santana's favor, as the Court must to determine qualified immunity, Deputy Pinto omitted material contextual information that shows he could not have believed Wyler was in fear for her life and in doing so he deprived the magistrate judge of the full picture for the probable cause determination. When considering the factual circumstances in full context, a jury could reasonably conclude that Deputy Pinto knew but omitted that there were *no* threats of physical harm to Wyler or the child and also that Santana had never threatened physical harm in the past. Deputy Pinto also knew that Santana had made the same type of statements before—that he would "get even" with Wyler and wished her death—in the context of being frustrated over not being allowed to exercise his right to communicate with the child or when stating that he might extend his visits by not timely returning the child in an effort to treat Wyler as he perceived she had treated him, which even Deputy Pinto agreed in his deposition testimony was nothing more than a "tit-for-tat" argument. *See* ECF No. 21–1 at 89. Deputy Pinto had seen the same type of messages from Santana in May, when he had threatened "to get even" with Wyler by not allowing her to communicate with the child during his visitation in June or by extending his visit.[17] Also Deputy Pinto had

[17] Santana wrote on May 11, "Keep me from talking to my daughter come June I'll get even with you, it will happen too, I'll see you in June." ECF No. 21–4 at 11. On May 13, he wrote, "you are no longer cooperating, It's fine, keep that energy, when I have her in June and I decide to keep her longer time if I want too." On May 18, Santana wrote that he intended to take Wyler back to court in 3 months for a custody hearing and that he did not have to communicate with Wyler when he returned the child, "I will just give you my itinerary to drop her off June 18th in Florida." And

twice previously determined that Santana's messages were offensive but were not death threats. Deputy Pinto knew but omitted that Santana had apologized when confronted about the messages in April. And while Santana's messages had continued sporadically for over a year, the statements made in the five-month period referenced in the affidavit had not escalated—no new or substantively different messages were disclosed on September 6 to cause concern other than that Santana was coming to town for a visit with the child.[18] The August 31 messages stating he would "get even" with Wyler this weekend indicated that he felt Wyler was "trying to isolate" him from the child, and, as before, he was asking to talk to his daughter. ECF No. 21–4 at 10.

While not every prior interaction with a complaining witness needs to be included in an affidavit, Deputy Pinto's omission of critical context about his prior interactions with Wyler added to the misleading nature of the affidavit. He omitted that on an earlier occasion he had told her how to obtain a restraining order if she

---

Santana wrote on May 23, "You deserve all evil coming to you and I hope it hits you hard," and "We'll go to court soon. And in June, I'll return the favor when I have our daughter you will not have any FaceTime or communication with her as it's not part of the court order." ECF No. 21–4 at 8.

[18] ECF No. 21–1 at 104:6-11 (Question: "[O]n September 6th [the third time you were dispatched to Wyler's home,] something had changed because we had a different outcome [you wrote an affidavit for an arrest warrant]?" Answer: "Yes, sir." Question: "What changed?" Answer: "Well, it went from threats over text message to enough to have for harassment."). Although Wyler said she was in fear because Santana said he would get even with her, the August 31 text message shows the statement was made in the context of a custody dispute and the same statement had been made in May about a June visitation, with no evidence that any incident arose from that.

was in fear, which she did not previously pursue; that on September 6 Wyler told him she wanted Santana arrested and served in jail to save her the cost of serving him and to avoid going to California for a restraining order as her lawyer had suggested; and that Wyler also stressed that she wanted Deputy Pinto's report to include all incidents as documentation for her custody hearing. This does not support the conclusion that Wyler was in fear for her life. Moreover, in his own deposition testimony, Deputy Pinto admitted he chose not to include facts in the affidavit that would have detracted from the probable cause determination.[19]

Considering this additional but omitted context with all inferences and conflicts in the record viewed in Santana's favor, Deputy Pinto could not have had a reasonable belief in the veracity of his statement that Wyler had a well-founded fear for her life. Additionally, the above recited omitted context plainly shows that Santana's threat to "get even" with Wyler, while a true statement, was also misleading because it omitted critical context from the messages that showed that the threats had nothing to do with physical harm but instead related to the couple's continued "tit for tat" custody dispute. *See Aguirre*, 158 F.4th at 1305 (indicating

---

[19] *See* ECF No. 21-1 at 140:12-25, 141:1 ("My probable cause statement . . . is only giving the information critical to a judge to make a decision on whether or not its enough. I am not there to go [write], well, he said he will get even with her over her daughter [before], but the conversation has escalated and now he's coming into town and saying he's going to get even with her. I don't know if he's going to come here and get even with her physically or he's going to harm her in any way, shape or form.").

an officer cannot ignore facts known to him that add to or detract from the reliability of his conclusion).

To cure the affidavit, the Court must consider the omitted context, which is material to Deputy Wyler's belief of whether there was a well-founded fear for Wyler's life or her children. The facts—that Santana was coming this weekend to "get even" with Wyler, that he had sent "obscure messages wishing her death," and that he continued making "threats"—considered with the above-stated additional context, do not support such a belief and in fact show that no physical harm was threatened or implied. What remains does not arguably show that Wyler suffered "substantial emotional distress" as required under the stalking statute. The law is clear that the threshold for "substantial emotional distress" for purposes of the stalking statute is high and measured on an objective basis. *Carvajal,* 434 So. 3d at 81. At most, the facts, including the omitted context, suggest heated animosity between parents in a custody dispute. Uncivil and unpleasant communications such as "angry social media messages," generally have been found insufficient to show substantial emotional distress.[20] *See e.g.*, *Benhalima v. Iakovenko*, 2026 WL

[20] Deputy Pinto relies on *Floyd v. Stoumbos* to argue that the facts here are sufficient to find arguable probable cause that there was substantial emotional distress. In *Floyd,* there was arguable probable cause where a neighbor had harassed the plaintiff by blaring loud music from radios located outside his property continuously for months from early morning until late evening. The plaintiff had described the noise from the radios as "brutal" and "life altering." *Floyd*, 2023 WL 2592297 at * 1. But here, the cured affidavit is all this Court can consider in assessing arguable probable cause for substantial emotional distress and the facts within the cured affidavit involving

2177426, at *4 (Fla. 2d DCA July 29, 2026) ("Mere irritation, annoyance, embarrassment, exasperation, aggravation, and frustration, without more, does not equate to substantial emotional distress.") (internal quotations omitted); *Carvajal,* 434 So. 3d at 81 (feeling frightened, losing sleep, and experiencing anxiety deemed insufficient, noting the statute "does not protect against all emotional discomfort"). Thus, viewing the facts in Santana's favor precludes qualified immunity at the summary judgment stage because the cured affidavit does not provide arguable probable cause for stalking.[21]

However, this is not the end of the inquiry because Santana has also moved for summary judgment on liability, arguing, for the reasons set out above, that he is entitled to judgment as a matter of law because the misstatements and omissions negate probable cause. But for purposes of his motion, the Court views the record and all inferences in *Deputy Pinto*'s favor and finds that there remains a question of fact about Deputy Pinto's motive and belief in making the statement that Wyler had a well-founded fear for her life and children. According to Deputy Pinto, he accurately reported that he perceived Wyler to be in fear on September 6. He found it significant that Wyler was still complaining of death threats; that Santana had

---

uncivil communications within a child custody dispute are markedly distinguishable from the constant barrage of physical noise identified in *Floyd.*

[21] The issue can be raised again at trial, where Deputy Pinto can urge the jury to resolve this underlying fact in his favor and request that the Court submit special interrogatories for the jury to resolve this issue. *See Butler*, 85 F.4th at 1118 n.6.

continued sending messages wishing her death, evil, bad karma; and that Santana stated he would "get even" with her this weekend, even after being warned that the messages were getting out of hand. Now that Santana coming to town, Deputy Pinto saw danger in the situation and did not want to take chances.

Deputy Pinto relies on his perception of Wyler and his experience with domestic abuse cases to support his conclusion that additional context was not necessary here. This is in dispute. Generally, an officer filing an affidavit in support of an arrest warrant may rely on a victim's complaint as support for probable cause, as long as essential context is not purposefully omitted, because officers have leeway to make reasonable mistakes. *See Butler*, 85 F.4th at 1114. Part of the problem in this case is that Deputy Pinto himself offered conflicting testimony in his deposition and in the prior criminal trial about his beliefs on whether Wyler had a well-founded fear, stating in one account that she was in fear while in another instance testifying that he had no basis for knowing whether Santana meant to harm her.[22] However,

---

[22] Deposition testimony of Deputy Pinto shows conflicting responses. *Compare* ECF No. 21-1 at 140:12-25, 141:1 ("My probable cause statement . . . is only giving the information critical to a judge to make a decision on whether or not its enough. I am not there to go [write], well, he said he will get even with her over her daughter [before], but the conversation has escalated and now he's coming into town and saying he's going to get even with her. I don't know if he's going to come here and get even with her physically or he's going to harm her in any way, shape or form.") *with id.* at 136:6-12 (Deputy Pinto nonetheless testifying earlier in his deposition without qualification that he believed Santana would be coming into town to harm Wyler). Deputy Pinto's testimony is critical in this case because of how he characterizes his own beliefs. This case is unique because Deputy Pinto appears to admit at times that he did not believe Wyler faced mortal peril (despite that being the substance of what he proffered).

Page 29 of 30

the Court cannot assess credibility on summary judgment. *See Acosta v. Miami-Dade Cnty.*, 97 F.4th 1233, 1238 (11th Cir. 2024) (stating "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, so they are not appropriate determinations to make at the summary judgment stage") (internal quotations omitted, alteration accepted).

Viewing all reasonable inferences in Deputy Pinto's favor, a jury could draw the inference that he reasonably perceived the situation as evolving into a threat to Wyler's safety, even if mistaken, and consequently, the same jury could conclude that there was probable cause to find that Wyler suffered substantial emotional distress for purposes of Florida's stalking statute. Thus, Santana is also not entitled to summary judgment.

Accordingly:

1. Santana's Partial Motion for Summary Judgment on liability, ECF No. 22, is **DENIED**.

2. Pinto's Cross Motion for Summary Judgment, ECF No. 25, is **DENIED**.

3. A jury trial will be scheduled by separate order.

**DONE AND ORDERED** this 30th day of September 2026.

*M. Casey Rodgers*

**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**